2022 IL App (2d) 210088
No. 2-21-0088
Opinion filed March 15, 2022

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| SWEET BERRY CAFÉ, INC., | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Plaintiff and Counterdefendant-Appellant, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 20-CH-266 |
| | ) | |
| SOCIETY INSURANCE, INC., | ) | |
| | ) | Honorable |
| Defendant and Counterplaintiff-Appellee. | ) | Kevin T. Busch, |
| | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justice Brennan concurred in the judgment and opinion.
Justice McLaren specially concurred, with opinion.

**OPINION**

¶ 1    In this insurance coverage case, plaintiff, Sweet Berry Café, Inc. (Café), sought a declaration that its commercial property insurance policy with defendant, Society Insurance, Inc. (Society), covered business income losses it suffered due to the COVID-19 pandemic and the Governor's executive orders, which restricted in-person dining, but not carryout or delivery services, at restaurants and similar establishments. The trial court entered judgment on the pleadings (735 ILCS 5/615(e) (West 2020)) in Society's favor. Café appeals, arguing that (1) the policy's coverage under the "Business Income" and "Extra Expense" provisions for "direct physical loss of or damage to Covered Property" includes losses due to the pandemic and the orders

and (2) the "Ordinance or Law" exclusion does not preclude coverage, because it applies in limited situations and, in any event, proclamations or executive orders are neither laws nor ordinances. We hold that neither the presence of the virus at Café's premises nor the pandemic-triggered executive orders that barred in-person dining at restaurants constitute "direct physical loss of or damage to" Café's property. Given that we conclude that there was no coverage, we need not reach Café's argument concerning the ordinance or law exclusion. Affirmed.

¶ 2                                I. BACKGROUND

¶ 3                              A. Complaint Allegations

¶ 4     On May 27, 2020, Café, located in South Elgin, filed a declaratory-judgment complaint (735 ILCS 5/2-701 (West 2020)), seeking coverage, under a "Businessowners Policy" it purchased from Society, for losses resulting from restricted operations during the pandemic. In a September 18, 2020, first amended complaint, Café sought coverage under the policy's "Business Income" "Extra Expense", and "Civil Authority" provisions. Café alleged that it sustained "direct physical loss of or damage to" property at its premises resulting from the SARS-CoV-2 virus and/or the pandemic and that the virus and the pandemic are "Covered Causes of Loss" under the policy. Further, it alleged that it incurred covered losses resulting from the Governor's orders.

¶ 5     The complaint noted that, after the World Health Organization characterized the COVID-19 outbreak as a pandemic, the Governor, Jay Robert Pritzker, issued Executive Order 2020-7 on March 16, 2020, whose goal was to slow the spread of the virus by minimizing in-person interaction in an environment with "frequently used services in public settings, including bars and restaurants," stating that the reduction of on-premises consumption of food and beverages was warranted. Exec. Order No. 2020-7, 44 Ill. Reg. 5536 (Mar. 16, 2020), https://www.illinois.gov/government/executive-orders/executive-order.executive-order-number-

7.2020.html [https://perma.cc/A4AF-T8TT].[1] On March 20, 2020, the Governor issued a closure order (Executive Order 2020-10, the stay-at-home order), requiring Illinois residents to stay at home, except for essential travel for essential work, supplies, and outdoor activities through April 7, 2020. Exec. Order No. 2020-10, 44 Ill. Reg. 5857 (Mar. 20, 2020), https://www.illinois.gov/government/executive-orders/executive-order.executive-order-number-10.2020.html [https://perma.cc/AL3B-TXGW]. The order also reduced the allowable public and private gathering size to no more than 10 people.[2] *Id.* The stay-at-home order was subsequently extended to May 29, 2020. Exec. Order No. 2020-33, 44 Ill. Reg. 8425 (Apr. 30, 2020), https://www.illinois.gov/government/executive-orders/executive-order.executive-order-number-33.2020.html [https://perma.cc/D337-TNHC]. The requirements of the March 20, 2020, order, including the classification as essential businesses of restaurants and establishments engaged in the retail sale of alcohol, were renewed. Exec. Order No. 2020-32, 44 Ill. Reg. 8409 (Apr. 30, 2020), https://www.illinois.gov/government/executive-orders/executive-order.executive-order-number-32.2020.html [https://perma.cc/5PW8-5DLT].

---

[1] The order restricted in-person consumption of food or beverages but permitted off-premises consumption through delivery and curbside pickup and allowed customers to enter premises to purchase food or beverages for carryout. Exec. Order No. 2020-7, 44 Ill. Reg. 5536 (Mar. 16, 2020).

[2] The order defined as essential businesses restaurants that prepared and served food for consumption off-premises and through delivery and carryout. It also designated as essential businesses establishments that sold alcoholic and nonalcoholic beverages. Exec. Order No. 2020-10, 44 Ill. Reg. 5857 (Mar. 20, 2020).

¶ 6    Café asserted that it sustained losses due to the orders addressing the virus and the pandemic. It was required to cease and/or significantly reduce operations at its locations. The orders, it alleged, prohibited access to its premises and continued orders required Café to cease and/or significantly reduce operations at, and prohibited access to, its premises. Café also alleged that it sustained losses due to the virus's physical presence "at, in, on, and/or around" its premises and due to its presence and spread in the community. It also asserted that the virus can be transmitted by way of human contact with surfaces, human-to-human contact at the premises, and human contact with airborne particles emitted into the air at the premises. The virus, Café argued, rendered items of physical property unsafe and impaired its value and function and physically altered the air.

¶ 7                                   B. Society's Policy

¶ 8    Society's policy (No. BP18040353-5, for the policy period from December 31, 2019, through December 31, 2020) includes forms published by Insurance Services Office, Inc. (ISO), and used in the insurance industry. The policy does not include the ISO standard virus exclusion form or otherwise reference the word "virus," other than in reference to a computer virus, and it contains no reference to "pandemic."

¶ 9    In the "Business Owners Special Property Coverage Form," the policy states:

> "A. Coverage
>
> We will pay for *direct physical loss of or damage to* Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of loss.
>
> * * *
>
> 3. Covered Causes of Loss

*Direct Physical Loss*[3] unless the loss is excluded or limited under this coverage form." (Emphases added.)

¶ 10     The policy also contains certain "Additional Coverages," which are the focus of this appeal, including for "Business income":

"5. Additional Coverages

\* \* \*

g. Business Income

(1) Business Income

(a) We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration[.'] The suspension must be caused by *direct physical loss of or damage to* covered property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss

\* \* \*(b) We will only pay for loss of Business Income that you sustain during the 'period of restoration' and that occurs within 12 consecutive months after the date of direct physical loss or damage." (Emphasis added.)

¶ 11     Another additional coverage is for "Extra Expense":

"h. Extra Expense

---

[3] Although the term is capitalized, it is not defined in the policy.

(1) We will pay necessary Extra Expense you incur during the 'period of restoration' that you would not have incurred if there had been no *direct physical loss or damage to* covered property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss." (Emphasis added.)

¶ 12    The "Exclusions" section of the property coverage form contains the "Ordinance or Law" exclusion:

"B. Exclusions

1. We will not pay for *loss or damage* caused directly or indirectly by any of    the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

a. Ordinance or Law

*The enforcement of or compliance with any ordinance or law*:

(1) *Regulating the* construction, *use* or repair *of any property*; or

(2) Requiring the tearing down of any property, including the cost of removing its debris.

This exclusion, Ordinance Or Law, applies whether the loss results from:

(1) An ordinance or law that is enforced even if the property has not been damaged; or

(2) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation,

remodeling or demolition of property or removal of its debris, following a physical loss to that property." (Emphases added.)

¶ 13 Finally, the "Property definitions" section states:

"H. Property Definitions

\* \* \*

12. 'Period of restoration' means the period of time that:

a. Begins immediately after the time of direct physical loss or damage for Business Income or Extra Expense coverage caused by or resulting from any covered Cause of Loss at the described premises; and

b. Ends on the earlier of:

(1) The date when the property at the described premises should be *repaired, rebuilt or replaced* with reasonable speed and similar quality; or

(2) The date when business is resumed at a new permanent location. 'Period of restoration' includes any increased period required to repair or reconstruct the property to comply with the minimum standard of, or compliance with any ordinance or law, in force at the time of loss, that regulates the construction or repair, or requires the tearing down of property.

The expiration date of this policy will not cut short the 'period of restoration[.'] " (Emphasis added.)

¶ 14 C. Society's Countercomplaint

¶ 15 Society filed a countercomplaint for declaratory judgment, seeking a declaration that Café's alleged loss of business income was not caused by a covered cause of loss; Café had not sustained a "direct physical loss of or damage to Covered Property"; the policy did not cover the

losses Café claimed under the business income, extra expense, or civil authority additional coverages; and the ordinance or law, "Consequential Loss," and "Acts or Decisions" exclusions excluded Café's claim.

¶ 16                    D. Society's Motion for Judgment on the Pleadings

¶ 17    On October 23, 2020, Society also moved for judgment on the pleadings (735 ILCS 5/615(e) (West 2020)), arguing that there was no coverage as a matter of law for Café's alleged losses related to the pandemic and the executive orders issued in response, because the claims did not satisfy the terms and conditions of the policy.[4]

¶ 18    Specifically, as to the business income or extra expense additional coverages, Society argued that there was no coverage because (1) "physical" loss is one that causes a change in the physical characteristics of the covered property, not an intangible loss such as diminution in value; (2) the partial temporary limitation of Café's operations imposed by the executive orders was not a "physical loss" or "damage" as a matter of law and was similar to a change in zoning that alters the hours a business can be open or a reduction of building capacity, not a physical alteration in the property; (3) the actual or suspected presence of the virus on the property did not cause a "direct physical loss" or "damage" and was not a covered cause of loss because it did not physically alter the property or render the premises unsafe, the virus could be removed with cleaning agents, and Café's losses were, at most, economic, not a "direct physical loss" or "damage"; and (4) the period-

---

[4] Society noted that Café was completely closed between March 16 and May 29, 2020 (the period that Executive Orders 2020-07 and 2020-10 were in effect), even though it was allowed to fulfill carryout and delivery orders during that period. It also asserted that, beginning on June 5, 2020, Café sold food for delivery and carryout.

of-restoration clause was further evidence that "physical loss" or "damage" required a tangible change in the physical characteristics of the property, where it refers to a "loss" or "damage" that causes a "physical" alteration of the property requiring the property to be repaired, rebuilt, or replaced.

¶ 19    Society also argued that the ordinance or law exclusion prevented coverage for Café's claim. It argued that, even if Café could establish coverage, its claim was barred by this exclusion, which excluded losses caused by ordinances or laws that regulate the use of any property.

¶ 20    Society sought judgment in its favor and against Café as to Society's counterclaim and Café's complaint.

¶ 21                                    E. Trial Court's Ruling

¶ 22    On February 4, 2021, the trial court granted judgment on the pleadings in Society's favor and against Café, finding no coverage. The court noted that the policy provided coverage arising from a "direct physical loss of" property and "damage" to property. Regarding  "direct physical loss," the court noted that the dictionary definition of "loss" was "the act of losing possession" and deprivation. Deprivation, in turn, means the "state of being kept from possessing, enjoying, or using something." The court determined that the loss of the use of property is a covered loss and, had Society intended a different meaning, it could have defined the terms. The court found the term "direct physical loss" to be unambiguous.

¶ 23    Further, the court noted that it would reach the same conclusion considering the type of policy, the nature of the risks involved, and the overall purpose of the contract. It characterized the policy as an all-risk policy that covered "direct physical loss," unless it was specifically excluded. It noted that the parties could have, but did not, agree to exclude losses caused by viruses. The court found "conceivable" that a viral pathogen could render the property unusable for a time.

Construing the policy strictly against Society and broadly for coverage, the court found that the policy covered "lost income resulting from the temporary loss or limited use of covered property when the direct loss of use is caused by viral contamination."

¶ 24    Next, the court addressed Café's two asserted reasons for its lost income: the virus's omnipresence, which renders the building unsafe for normal use at full capacity, and the executive orders that severely restricted how restaurants may operate, primarily limiting them to preparing food on site for delivery and carryout. First, as to the virus, the court noted that Café had been operating during the pandemic, consistent with the Governor's restrictions. Its allegations relating to any actual physical damage, the court found, were "speculative and hyperbole." It took judicial notice of the fact that the virus had not rendered other businesses unsafe or unusable and that the virus is easily destroyed with cleaning agents and ultraviolet light. Thus, Café had failed, it found, to allege a covered loss.

¶ 25    Second, as to the executive orders, the court determined that they were the reason that Café had reduced or restricted its operations. However, this did not trigger coverage. Such losses were excluded, it determined, because they resulted from "enforcement or compliance with any ordinance or law." The court found that Café was prevented from fully using its premises, because it chose to comply with the restrictions, not because of viral contamination.

¶ 26    Café appeals. The Restaurant Law Center and the Illinois Restaurant Association filed a brief as *amici curiae* in support of Café's position. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010). The American Property Casualty Insurance Association and the National Association of Mutual Insurance Companies filed a brief as *amici curiae* in support of Society's position. *Id.*

¶ 27                                   II. ANALYSIS

¶ 28                              A. Preliminary Matter

¶ 29    Initially, we address Society's argument that Café's nature-of-the-case statement violates Illinois Supreme Court Rule 341(h)(2) (eff. Oct. 1, 2020) because it is impermissibly argumentative and fails to provide required information. Society asks that we strike the statement and offers one in its place.

¶ 30    Rule 341(h)(2) requires an introductory paragraph, stating (1) the nature of the action and of the judgment appealed from and whether the judgment is based upon the verdict of a jury and (2) whether any question is raised on the pleadings and, if so, the nature of the question. *Id.* We agree that Café's statement is argumentative. See *Artisan Design Build, Inc. v. Bilstrom*, 397 Ill. App. 3d 317, 321 (2009) (introductory statement containing argument violates Rule 341(h)(2)). The Illinois Supreme Court rules are not suggestions; they have the force of law and must be followed. *People v. Campbell*, 224 Ill. 2d 80, 87 (2006); *Kerger v. Board of Trustees of Community College District No. 502*, 295 Ill. App. 3d 272, 275 (1997). However, " '[w]here violations of supreme court rules are not so flagrant as to hinder or preclude review, the striking of a brief in whole or in part may be unwarranted.' " *Hubert v. Consolidated Medical Laboratories*, 306 Ill. App. 3d 1118, 1120 (1999) (quoting *Merrifield v. Illinois State Police Merit Board*, 294 Ill. App. 3d 520, 527 (1997)). Here, Café's violations do not hinder our review to the point that striking the brief in whole or in part would be appropriate, but we will disregard the noncompliant portions of Café's statement. We also admonish counsel to carefully follow the supreme court rules in future submissions.

¶ 31         B. Standard of Review and Contract Interpretation Principles

¶ 32    The trial court granted judgment on the pleadings in Society's favor and against Café. Section 2-615(e) of the Code of Civil Procedure (Code) (735 ILCS 5/2-615(e) (West 2016)) provides that "[a]ny party may seasonably move for judgment on the pleadings." A motion for

judgment on the pleadings is like a motion for summary judgment but is limited to the pleadings. *Perry v. Fidelity National Title Insurance Co.*, 2015 IL App (2d) 150168, ¶ 9. Thus, a judgment on the pleadings is proper only when the pleadings disclose no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 385 (2005). In ruling on a motion for judgment on the pleadings, the court considers only those facts apparent from the face of the pleadings, matters subject to judicial notice, and judicial admissions in the record. *Id.* A party moving for judgment on the pleadings concedes the truth of the well-pleaded facts in the nonmovant's pleadings. *Allstate Property & Casualty Insurance Co. v. Trujillo*, 2014 IL App (1st) 123419, ¶ 16. The court deciding the motion must take all reasonable inferences from those facts as true, disregard all conclusory allegations and surplusage, and construe the evidence strictly against the movant. *Parkway Bank & Trust Co. v. Meseljevic*, 406 Ill. App. 3d 435, 442 (2010). We review *de novo* a trial court's ruling on a motion for judgment on the pleadings. *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 65.

¶ 33 Under Illinois law, the general rules governing the interpretation of contracts govern the interpretation of insurance policies. *Bituminous Casualty Corp. v. Iles*, 2013 IL App (5th) 120485, ¶ 20. A court's primary objective in construing the language of a policy is to ascertain and give effect to the intentions of the parties as expressed in their agreement. *Pekin Insurance Co. v. Precision Dose, Inc.*, 2012 IL App (2d) 110195, ¶ 31. If the policy terms are clear and unambiguous, they must be given their plain and ordinary meanings. *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 479 (1997). The "usual and ordinary" meaning of a phrase is " 'that meaning which the particular language conveys to the popular mind, to most people, to the average [person], *** to a business [person], or to a lay [person].' " *Outboard Marine Corp. v. Liberty*

*Mutual Insurance Co.*, 154 Ill. 2d 90, 108 (1992) (quoting 2 Couch on Insurance 2d § 15:18 (rev. ed. 1984)).

¶ 34    When interpreting an insurance policy, the agreement is to be enforced as written so long as it is unambiguous and only to the extent that it does not contravene public policy. *Gibbs v. Madison Mutual Insurance Co.*, 242 Ill. App. 3d 147, 152 (1993). In determining whether there is an ambiguity, a court must construe the policy as a whole, instead of looking at isolated parts of the policy, and consider the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 455 (2010) (citing *Koloms*, 177 Ill. 2d at 479); see also *Gibbs*, 242 Ill. App. 3d at 152 (in determining an ambiguity, the provision must be read in its factual context and not in isolation). An ambiguity exists when the language is obscure in meaning through indefiniteness of expression or where the language is reasonably susceptible to more than one meaning. *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004). A contract is not rendered ambiguous merely because the parties disagree on its meaning. *Id.* Additionally, we will not strain to find an ambiguity where none exists, nor will we consider an interpretation that is unreasonable or leads to absurd results. *United States Fire Insurance Co. v. Hartford Insurance Co.*, 312 Ill. App. 3d 153, 155 (2000). "A policy term is not ambiguous because the term is not defined within the policy or because the parties can suggest creative possibilities for its meaning." *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 529-30 (1995).

¶ 35    If the language is reasonably susceptible to more than one meaning, it is considered ambiguous and will be construed strictly against the insurer, who drafted the policy. *Koloms*, 177 Ill. 2d at 479. Provisions that limit or exclude coverage are interpreted even more liberally in favor of the insured. *Id.* The test is not what the insurer intended its words to mean, but what a reasonable

person in the insured's position would understand them to mean. *Insurance Co. of Illinois v. Markogiannakis*, 188 Ill. App. 3d 643, 655 (1989). If an insurer relies on an exclusionary provision, it must be clear and free from doubt that the provision prevents coverage. *Cincinnati Insurance Co. v. American Hardware Manufacturers Ass'n*, 387 Ill. App. 3d 85, 108 (2008). We review *de novo* issues of contract interpretation, including whether a contract is ambiguous. See *Central Illinois Light*, 213 Ill. 2d at 153.

¶ 36                    C. Business Income and Extra Expense Coverages

¶ 37    Café first argues that the trial court erred in finding that its loss was not covered because the virus had not rendered other businesses unusable, was easily destroyed, and did not prevent all use of the property. Café contends that the virus was the root cause of its restricted use of its premises and, thus, its loss of income, and that Society's policy covered that loss. It contends that the trial court erred in taking judicial notice that the virus had not rendered other businesses unusable and that the virus is easily destroyed. Café maintains that the court was required to accept as true its allegations that the virus can remain suspended in the air for hours and remains active on surfaces for up to 72 hours. Also, Café asserts, it is capable of being transmitted in that fashion and, consequently, rendered the property unsafe. For those reasons, Café contends, it lost the full use of the premises. Café argues that the court erred in going outside the pleadings by improperly invoking judicial notice where the facts were disputed. It also points to the court's comparison of use of restaurants like Café with use of grocery stores, liquor stores, and retail stores. The latter, according to Café, were not so significantly impacted by the virus or the executive orders because of a critical difference between their use and use of restaurants: restaurant patrons must remove their masks to use the premises, resulting in exposure to the virus. This is why restaurants are presumably subject to stricter regulations. The court, Café asserts, declared things to be true about

the virus that were not matters of common knowledge or capable of verification. This made it all the more important, Café argues, for it to have the opportunity to rebut those findings. Accordingly, it maintains, the court erred in finding that the virus did not prevent the use of the premises, which was a fact to be determined at trial.

¶ 38 Society responds that neither the Governor's orders nor any alleged presence of the virus altered the tangible, physical characteristics of the premises or permanently physically dispossessed Café of its property. Café's temporary reduction in operations, Society contends, was not the result of a "direct physical loss of or damage to" insured property.

¶ 39 We conclude that the policy unambiguously requires a physical alteration or substantial dispossession, not merely loss of use, which is what Café sufficiently pleaded it experienced. Both the business income and extra expense coverage provisions in Society's policy require a "direct physical loss of or damage to" Café's property that is "caused by or resulting from a Covered Cause of Loss" and provide coverage for certain losses occurring "during the 'period of restoration.' " A covered cause of loss is defined as a "Direct Physical Loss unless the loss is excluded or limited under this coverage form."

¶ 40 The policy does not define "direct physical loss of or damage to." The term "physical loss" is more relevant to our inquiry. "Loss" means "the act or fact of being unable to keep or maintain something or someone" (Merriam-Webster's Online Dictionary, www.merriam-webster.com/dictionary/loss (last visited Mar. 2, 2022) [https://perma.cc/Y7C8-5SRA]) or "DEPRIVATION" (Webster's Third New International Dictionary (1993)). The term "physical" modifies "loss." "Physical" means "having material existence: perceptible especially through the senses and subject to the laws of nature" and "of or relating to material things." Merriam-Webster's Online Dictionary, www.merriam-webster.com/dictionary/physical (last visited Mar. 2, 2021)

[https://perma.cc/P2HX-KAVB]. Finally, the term "direct" means "marked by absence of an intervening agency, instrumentality, or influence" or "characterized by close logical, causal, or consequential relationship." Merriam-Webster's Online Dictionary, www.merriam-webster.com/dictionary/direct (last visited Mar. 2, 2021) [https://perma.cc/D8Y9-2LAK]. Thus, "physical loss" unambiguously requires that the deprivation be caused by a material thing, which necessarily rules out economic losses resulting from Café's inability to fully run its business. The trial court ignored the term "physical" and, instead, looked only at the definition of "loss" in determining that loss of use is a covered loss.

¶ 41    In our supreme court's decision in *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278 (2001), its interpretation of the term "physical injury to tangible property," is consistent with the dictionary definition of "physical" upon which we rely. Unlike here, *Eljer* involved several comprehensive general liability policies. At issue was the trigger for indemnity coverage in thousands of product liability claims alleging "property damage" arising out of the failure of a residential plumbing system. The policies that were controlled by Illinois law defined "property damage" as "physical injury to or destruction of tangible property." *Id.* at 287. The insurers took the position that indemnity coverage was triggered when the system first leaked, and the policyholders argued that it was triggered at the time the system was installed. The supreme court held that "physical injury to tangible property" was not ambiguous and that tangible property suffers "physical" injury when that property is "altered in appearance, shape, color or in other material dimension." *Id.* at 301 (relying on dictionary definition). Tangible property does not experience physical injury "if that property suffers intangible damage, such as diminution in value as a result from the failure of a component *** to function as promised." *Id.* at 301-02, 310, 312.

¶ 42    Mindful of the policy's unambiguous requirement that the deprivation be caused by a material thing, we turn to consider Café's specific arguments. In its complaint, Café alleged that it sustained losses both due to the virus's presence at and around its premises and due to the executive orders. Both theories fail.

¶ 43    First, Café alleged that the virus has a material existence and physically damages tangible property by rendering it unusable because it adheres to surfaces, creating a dangerous property condition and "direct physical loss of or damage to" the property. Case law assessing asbestos claims and noxious gas contamination cases, which present analogous scenarios, have held that such intangible damage *may* cause "physical loss" or physical "damage." See, *e.g.*, *Inns by the Sea v. California Mutual Insurance Co.*, 286 Cal. Rptr. 3d 576, 587-89 (Ct. App. 2021) (citing cases addressing presence of ammonia, wildfire smoke, asbestos, unsafe carbon monoxide levels, odor from methamphetamine operation, persistent cat urine odor, or sulfuric gas); see also *Farmers Insurance Co. of Oregon v. Trutanich*, 858 P.2d 1332, 1335-36 (Or. Ct. App. 1993) (relying on case law addressing airborne particulates and first holding that pervasive odor from methamphetamine operation was physical because it damaged a house; also, relying on a case involving gasoline and vapor contamination and infiltration, holding that the cost of removing the odor was a "direct physical loss," where odor produced by methamphetamine lab infiltrated the house). However, we agree with the case law that has found these cases distinguishable, because, unlike here, the substances rendered the premises unusable. See, *e.g.*, *Inns by the Sea*, 286 Cal. Rptr. 3d at 588-90 (finding the asbestos, gas, and smoke cases inapplicable because the virus, unlike the substances in the other cases, did not cause the premises to be uninhabitable or unsuitable for their intended purpose, where the government orders were issued in response to the virus's presence in the community at large; even if the plaintiff had sterilized its premises, it would

still have had to suspend its operations to comply with the orders); see also *Sandy Point Dental, P.C. v. Cincinnati Insurance Co.*, 20 F.4th 327, 334 (7th Cir. 2021) (distinguishing gas cases on the basis that the contamination barred "all uses by all persons," whereas the COVID-19 virus only partially limited the plaintiffs' preferred use of their premises). The fact that the virus was present at Café's premises, an allegation we must accept as true, did not result in or cause "direct physical loss of or damage to" the property. This is because no property needed to be repaired or replaced. Furthermore, unlike a noxious gas, for example, the virus's presence is easily remediated by routine, not specialized or costly, cleaning and disinfecting or will die off after a few days, the latter of which Café pleaded. See *id.* at 335 (noting that, even if virus physically attached itself to the plaintiffs' premises, this did not constitute an allegation that the virus altered the physical structures to which it attached "and there is no reason to think that it could have done so"; virus "may be wiped off surfaces using ordinary cleaning materials, and it disintegrates on its own in a matter of days"); *Uncork & Create LLC v. Cincinnati Insurance Co.*, 498 F. Supp. 3d 878, 883-84 (S.D. W. Va. 2020) (actual presence of virus does not trigger coverage for physical damage or loss; "[b]ecause routine cleaning, perhaps performed with greater frequency and care, eliminates the virus on surfaces, there would be nothing for an insurer to cover, and a covered 'loss' is required to invoke the additional coverage for loss of business income under the Policy"); see also *Firenze Ventures LLC v. Twin City Fire Insurance Co.*, No. 20 C 4226, 2021 WL 5865710, at *5 (N.D. Ill. Dec. 10, 2021) (citing cases); see also *COVID-19: Cleaning and Disinfecting Your Facility*, Cents. for Disease Control & Prevention (Nov. 15, 2021), https://www.cdc.gov/ coronavirus/2019-ncov/community/disinfecting-building-facility.html **[**https://perma.cc/3NNT-HK3M] (noting that the most reliable way to prevent infection from surfaces is to regularly wash hands with soap and water or to use alcohol-based hand sanitizer; also noting that surfaces should

be cleaned and disinfected if someone with the virus was present and providing list of disinfectants, many of which are readily available consumer goods; *cf. Trutanich*, 858 P.2d at 1336 (chemical company hired to clean house that sustained observable smoke damage from methamphetamine lab; finding "direct physical loss" covered by policy). The trial court did not err in taking judicial notice of the ease of cleaning the virus off surfaces, as this is a matter of common knowledge about this virus. See *In re Marriage of Kohl*, 334 Ill. App. 3d 867, 874 (2002) (a court may take judicial notice of facts that are a matter of common and general knowledge and are well established and known within the court's jurisdiction).

¶ 44    As we must read the policy as a whole (*Wilson*, 237 Ill. 2d at 455; *Gibbs*, 242 Ill. App. 3d at 152), we note that the period-of-restoration provision supports our conclusion. The policy provides coverage of lost business income and extra expense during the "period of restoration," which begins at the time of "direct physical loss or damage *** caused by or resulting from any covered Cause of Loss" at the premises and ends on the earlier of (1) the date when the property "should be repaired, rebuilt or replaced with reasonable speed and similar quality" or (2) "[t]he date when the business is resumed at a new permanent location." It includes "any increased period required to repair or reconstruct the property to comply with the minimum standard of, or compliance with[,] any ordinance or law, in force at the time of loss, that regulates the construction or repair, or requires the tearing down of property." This provision assumes physical alteration of the property, not mere loss of use, because it provides coverage until the property "should be repaired, rebuilt or replaced." "Repair," which is undefined in Society's policy, means "to restore by replacing a part or putting together what is torn or broken: FIX." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/repair (last visited Mar. 2, 2022) [https://perma.cc/Q63P-QAZD]. "Rebuild" means "to make extensive repairs to:

RECONSTRUCT." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/ dictionary/rebuild (last visited Mar. 2, 2022) [https://perma.cc/VPH9-F9YV]. Property that has sustained "physical loss" or physical "damage" requires restoration. Property that has not sustained such loss or damage has not sustained a "direct physical loss."

¶ 45    Café's second theory is that the executive orders prohibited access to its business and that the continued orders required it to cease and/or significantly reduce access to, and operations at, its premises. These orders, it asserts, caused "direct physical loss of or damage to" its property. We disagree. The executive orders did not cause a tangible "loss of or damage to" Café's property, which is what is required for coverage under the business income and extra expense provisions. They merely prohibited in-person dining, which is one use of the property, but permitted food preparation for carryout dining and delivery. Café seeks to equate loss of use with "direct physical loss," which it cannot do. The prohibition on in-person dining was not connected to any change in the physical condition of the premises or property at the premises, nor did it cause any physical harm to the premises or any property. It caused an economic loss for Café.

¶ 46    Café also argues that "direct physical loss" must mean something other than "direct physical damage." It contends that, otherwise, the policy contains surplus language. It argues that "direct physical loss" includes "loss of use." We disagree. Café's interpretation reads out the word "physical" from the policy. Nor does "loss" have the same meaning as "loss of use." Loss of use without "physical loss" is not covered. See *Firenze Ventures LLC*, 2021 WL 5865710, at *3 ("physical loss" does not refer to any deprivation; it refers to "a deprivation caused by a tangible or concrete change in the condition or location of the thing that is lost"). Further, here, the policy uses the term "loss of use" elsewhere, indicating that it has a different meaning than mere "loss." For example, in the exclusion for consequential losses, the policy provides that Society "will not

pay for loss or damage caused by or resulting from" consequential losses, specifically, "[d]elay, *loss of use* or loss of market." (Emphasis added.)

¶ 47    Finally, Café also notes that Society's policy did not contain a virus exclusion. We conclude that this is of no import here. Unless the policy already granted coverage, which it does not do, a virus exclusion was not necessary. Further, the absence of an exclusion cannot "create an ambiguity in an otherwise unambiguous insuring clause." *Inns by the Sea*, 286 Cal. Rptr. 3d at 593-94.

¶ 48    We note that our decision is consistent with the majority of cases throughout the country interpreting the application of similar provisions to pandemic-related losses. See *id.* at 579 n.1 (in opinion dated November 15, 2021, noting that "overwhelming majority of federal district court cases find no possibility of coverage under commercial property insurance policies for a business's pandemic-related loss of income" and each federal appellate court to consider the issue concluded the same; collecting cases); *Image Dental, LLC v. Citizens Insurance Co. of America*, 543 F. Supp. 3d 582, 591-92 (N.D. Ill. 2021) (citing cases); see also 10A Couch on Insurance § 148:46 (Steven Plitt *et al.* eds., 3d ed. Nov. 2021 update) ("The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.").

¶ 49    Indeed, all published federal appellate court decisions have ruled in the insurance companies' favor. See *Terry Black's Barbeque, L.L.C. v. State Automobile Mutual Insurance Co.*, 22 F.4th 450, 453, 455-58 (5th Cir. 2022) (applying Texas law and affirming judgment on the pleadings in insurer's favor; holding that the plaintiff restaurant group, which suspended dine-in

service in response to pandemic-related government orders, did not sustain "direct physical loss" of property under the business income or extra expense coverages; concluding that the plaintiff did not sufficiently allege any tangible alteration or deprivation of its property; this interpretation was consistent with period-of-restoration provision; the nature of the policy focused on commercial property, but the claimed loss was only an economic loss that did not have a tangible effect on the property; limitation on use of dining rooms was not a physical loss of property, but a loss of use for its intended purpose); *10012 Holdings, Inc. v. Sentinel Insurance Co.*, 21 F.4th 216, 220-23 (2nd Cir. 2021) (applying New York law and affirming dismissal for failure to state a claim; holding that the plaintiff art gallery, which had to resort to online sales in response to pandemic-related government orders, failed to sufficiently allege a "direct physical loss" under the policy's business income and extra expense coverages; case law required direct "physical" "damage," which was not alleged; New York courts applying New York law had reached the same conclusion in pandemic-related cases; and "direct physical loss" and "physical damage" did not extend to mere loss of use of premises, where there was no "physical damage" to the premises); *Goodwill Industries of Central Oklahoma, Inc. v. Philadelphia Indemnity Insurance Co.*, 21 F.4th 704, 709-12 (10th Cir. 2021) (applying Oklahoma law and affirming dismissal for failure to state a claim; holding that the plaintiff nonprofit, which suspended its retail store/donation center operations to comply with pandemic-related government orders, failed to sufficiently allege coverage under business income provision; policy did not cover "direct physical loss of" property for suspension-related losses; term required "immediate and perceptible destruction or deprivation of property," and the plaintiff did not lose physical control of its property, nor was it destroyed; intangible losses are not physical losses; "physical loss" includes deprivation of property without any damage to it, not deprivation of some particular use; period-of-restoration provision was

consistent with this meaning; and majority of courts had similarly construed the relevant terms); *Sandy Point Dental*, 20 F.4th at 329-37 (applying Illinois law and affirming dismissal of the plaintiffs' complaints for failure to state a claim, where the parties (dental practice, restaurant group, and hotel group) sought coverage for business losses resulting from either the virus or the closure orders; holding that the plaintiffs failed to allege "direct physical loss of or damage to" property; "[w]hatever 'loss' means, it must be physical in nature" because the term "direct physical" modifies "loss"; period-of-restoration provision supports this; majority of case law supports this; and gas-infiltration case law involved complete dispossession of property, thus, barring all uses by all persons, unlike in the case before it; virus did not alter premises, where it may be wiped off surfaces using ordinary cleaning materials); *Mudpie, Inc. v. Travelers Casualty Insurance Co. of America*, 15 F.4th 885, 890-93 (9th Cir. 2021) (under California law, pandemic shelter-in-place orders that prevented operation of the plaintiff's children's store did not cause "direct physical loss of or damage to" property under comprehensive commercial property policy for insured to recover loss of business income or extra expense; affirming dismissal of the complaint for failure to state a claim; the plaintiff did not allege that COVID-19 was present in its premises; California case law distinguished intangible, incorporeal, and economic losses from physical ones; policy's period-of-restoration provisions contemplated coverage only if there were physical alterations to property; foreign case law was consistent with this holding); *Santo's Italian Café LLC v. Acuity Insurance Co.*, 15 F.4th 398, 401-06 (6th Cir. 2021) (under Ohio law, pandemic-triggered government order barring in-person dining at a restaurant did not cause "direct physical loss of or damage to" property such that insured could recover business interruption losses; affirming dismissal for failure to state a claim; common and ordinary meaning of key terms required immediate tangible deprivation of property, which had not occurred—restaurant could

still be put to use in full, even if not for in-person dining, and the plaintiff did not argue that the virus physically and directly altered the property; nor did government orders do so; "loss of use simply is not the same as a physical loss"; period-of-restoration provisions supported holding, where there was nothing to repair, rebuild, or replace that would allow resumption of in-person dining; restaurant had not alleged that its property was unusable or uninhabitable; policy was unambiguous, and any overlap between "direct physical loss" and "direct physical damage" did not render it ambiguous); *Oral Surgeons, P.C. v. Cincinnati Insurance Co.*, 2 F.4th 1141, 1144-45 (8th Cir. 2021) (applying Iowa law and affirming dismissal of the plaintiff's complaint seeking coverage for lost business income and extra expenses sustained after the governor's orders restricted nonemergency procedures; holding that there was no "direct physical loss of or physical damage to" the plaintiff's property where it was unable to fully use its offices; policy unambiguously required "some physicality to the loss or damage of property," such as "a physical alteration, physical contamination, or physical destruction"; and this interpretation was consistent with period-of-restoration provision).

¶ 50 As Café notes, several district court decisions have interpreted similar insurance policy provisions to cover, or at least possibly cover, losses due to government COVID-19 closure orders. See, *e.g.*, *Seifert v. IMT Insurance Co.*, 542 F. Supp. 3d 874, 878-81 (D. Minn. 2021) (Minnesota law; executive orders closed the plaintiff's hair salon and barbershop; finding that Minnesota law did not require structural or tangible injury to property); *Derek Scott Williams PLLC v. Cincinnati Insurance Co.*, 522 F. Supp. 3d 457, 462-64 (N.D. Ill. 2021) (Texas law; government order postponed elective surgeries and nonemergency medical and dental procedures; declining to dismiss business income claims; finding that "physical loss" "is broad enough to cover *** a deprivation of the use of [the plaintiff's] premises" because that is its common meaning); *In re*

*Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation*, 521 F. Supp. 3d 729, 741-43 (N.D. Ill. 2021) (Illinois, Wisconsin, Minnesota, and Tennessee laws; restaurant and other hospitality-industry plaintiffs); *Elegant Massage, LLC v. State Farm Mutual Automobile Insurance Co.*, 506 F. Supp. 3d 360, 376 (E.D. Va. 2020) (the massage parlor plaintiff closed its business due to government closure order; plausible that parlor experienced "direct physical loss" when it was deemed uninhabitable and dangerous to use by the government orders because of its high risk of spreading virus; analogizing to noxious gas case law); *Studio 417, Inc. v. Cincinnati Insurance Co.*, 478 F. Supp. 3d 794, 800-03 (W.D. Mo. 2020) (Missouri law). However, disagreement among courts concerning the interpretation of a policy provision does not, by itself, render the provision ambiguous. See, *e.g.*, *Erie Insurance Group v. Sear Corp.*, 102 F.3d 889, 894 (7th Cir. 1996) (rejecting the argument that an insurance policy term was ambiguous "on the basis of conflicting case law" interpreting the term). Further, we are not persuaded by the analyses in this case law.

¶ 51    For example, in *In re Society Insurance Co.*, the district court denied Society's summary-judgment motion as to the policy's business income coverage. The disjunctive "or," the court found, meant that "physical loss" covers something different from "physical damage." *In re Society Insurance Co.*, 521 F. Supp. 3d at 741. The court determined that a reasonable jury could find that the plaintiffs suffered a "direct physical loss of" property on their premises by the restrictions on onsite dining because (1) the shutdown orders imposed a physical limit (the restaurants were limited from using much of their physical space) and (2) the period-of-restoration provision did not warrant a different finding because it described a time period during which business income losses would be covered, not an explicit definition of coverage, and it included

the terms "repaired" and "replaced," which could reference safety features, such as installation of partitions or a ventilation system. *Id.* at 742-43.

¶ 52    Similarly, in *Studio 417, Inc.*, the district court denied the insurer's motion to dismiss, finding that the plaintiff hair salons and restaurants had adequately alleged a "direct physical loss" under the policies. *Studio 417, Inc.*, 478 F. Supp. 3d at 800. First, it determined that the plaintiffs alleged a causal relationship between the virus and their losses, that the virus is a physical substance and lives on surfaces and is emitted into the air, and that the virus attached to and deprived them of their property, making it " 'unsafe and unusable, resulting in direct physical loss to the premises and property.' " *Id.* These allegations, the court found, plausibly alleged "direct physical loss" based on the ordinary meaning of the phrase. *Id.* Second, the court determined that "physical loss" was different from physical "damage" and that "physical loss" may occur when the property is uninhabitable or unusable for its intended purpose. *Id.* at 801-03 (citing, among others, an asbestos case and noting that contrary case law was decided at the summary-judgment stage, was factually dissimilar, and/or was not binding). The plaintiffs had alleged physical contamination by the virus, which was likely on their premises and caused them to cease or suspend operations. *Id.* at 802. Rejecting case law that held that the virus does not cause "direct physical loss," the district court commented that the presence of the virus on premises "is not a benign condition." *Id.* The plaintiffs, it found, plausibly alleged that the virus attached to and damaged their property, which caused the premises to be unsafe and unusable. *Id.*

¶ 53    We decline to follow these cases, because they ignore the unambiguous, plain, and ordinary meaning of "direct physical loss" and do not read the policies as a whole, the latter evidenced by their strained analyses of the period-of-restoration provisions. They also fail to closely read the noxious gas and related cases, which, as noted, were decided on the bases that the substances at

issue rendered the premises uninhabitable or resulted in substantial dispossession. In contrast, Café did not sufficiently plead that it was substantially dispossessed of its property by either the pandemic or the executive orders, as it was allowed to (and apparently did) provide carryout and delivery services to its patrons. Furthermore, it did not plead that it was required to hire specialized contractors to clear its premises of the virus; indeed, this is not required for the virus. The virus is certainly not benign, as evidenced by the over 800,000 deaths in this country (*COVID Data Tracker*, Cents. for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited Mar. 2, 2022) [https://perma.cc/K8XC-QE7X]), but where Café continued to operate with somewhat limited services and where the virus did not physically alter the property and where routine cleaning or the mere passage of a brief period eliminates it, Café's property did not become uninhabitable, nor did it sustain a substantial dispossession of its property.

¶ 54　　We are not unsympathetic to the immense challenges facing restaurants and other hospitality-service providers during the present pandemic. However, we must construe the contract into which the parties entered and hold them to their agreement.

¶ 55　　In summary, the partial loss of Café's use of its premises, without any physical alteration to the property or a deprivation of use or access so substantial as to constitute a physical dispossession, was not sufficient to allege a "direct physical loss of or damage to" its property to trigger coverage under Society's business interruption or extra expense additional coverages. Because we conclude that there is no coverage under the additional coverage provisions, we need not, and do not, consider whether any applicable coverage would be excluded under the ordinance or law exclusion.

¶ 56　　　　　　　　　　　　　　　III. CONCLUSION

¶ 57    For the reasons stated, the judgment of the circuit court of Kane County is affirmed.

¶ 58    Affirmed.

¶ 59    JUSTICE MCLAREN, specially concurring:

¶ 60    I specially concur because I wish to discuss a rule of construction. The Latin phrase *expressio unius est exclusio alterius* means that "to express or include one thing implies the exclusion of the other or alternative." Black's Law Dictionary 620 (8th ed. 2004) (also termed *inclusio unius est exclusio alterius*). This familiar maxim has been cited as authority as far back as 1806 by the United States Supreme Court (*Manella, Pujals & Co. v. Barry*, 7 U.S. (Cranch) 415, 430 (1806)) and 1891 by our supreme court (*McWilliams v. Morgan*, 61 Ill. 89, 93 (1891)). It applies to the interpretation of statutes (see, *e.g.*, *Schultz v. Performance Lighting, Inc.*, 2013 IL 115738, ¶ 17; *In re D.W.*, 214 Ill. 2d 289, 308 (2005)) and contracts (see, *e.g.*, *Lobo IV, LLC v. Land Chicago Canal, LLC*, 2019 IL App (1st) 170955, ¶ 83; *Krause v. GE Capital Mortgage Services, Inc.*, 314 Ill. App. 3d 376, 386 (2000)).[5]

¶ 61    The parties and the majority neither mention nor cite the rule. If Café had cited the rule, it would have compromised its argument regarding coverage because there was only one kind of loss listed. The rule limited coverage to only physical loss and excluded other forms of loss.

¶ 62    Concomitantly, if Society had cited the rule, it would have compromised its claim of exclusion of coverage because the Governor's executive orders are neither a law nor an ordinance.

---

[5] The rule also applies to supreme court rules. *In re Estate of Rennick*, 181 Ill. 2d 395, 404 (1998) ("In interpreting a supreme court rule, *we apply the same principles of construction that apply to a statute*." (Emphasis added.)).

Therefore, under the rule of construction, the failure to include an executive order in the exclusion would not have effectuated the exclusion.

¶ 63    The majority does not address the merits of the law or ordinance exclusion but states, "Such losses were excluded, [the trial court] determined, because they resulted from [']enforcement or compliance with any ordinance or law.['] " *Supra* ¶ 33. The majority is not required to address issues not necessary to the review of the judgment to affirm. See *West Bend Mutual Insurance Co. v. Krishna Schaumburg Tan, Inc.*, 2021 IL 125978, ¶ 60 (after affirming on another basis, the court concluded there was no need to address the remaining issue raised by the appellee). However, I specially concur because I wish to emphasize that the rule of construction should be utilized by trial courts regardless of whether the parties cite it.[6]

---

[6] An additional rule of construction requires a strict construction when there is an ambiguity or more than one reasonable interpretation. Where the language of an insurance policy is ambiguous, it should be construed against the insurer, which drafted the policy. *In re Estate of Striplin*, 347 Ill. App. 3d 700, 702 (2004). This doctrine, also known as *contra proferentem* ("[a]gainst the party who proffers or puts forward a thing" (Black's Law Dictionary 296 (5th ed. 1979))), requires that ambiguities be strictly construed against the drafter of the instrument. *International Minerals & Chemical Corp. v. Liberty Mutual Insurance Co.*, 168 Ill. App. 3d 361, 370-71 (1988).

---

**No. 2-21-0088**

---

| | |
|---|---|
| **Cite as:** | *Sweet Berry Café, Inc. v. Society Insurance, Inc.*, 2022 IL App (2d) 210088 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 20-CH-266; the Hon. Kevin T. Busch, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Michael W. Rathsack, and Antonio M. Romanucci, Gina A. Deboni, and David A. Neiman, of Romanucci & Blandin, LLC, both of Chicago, and Robert P. Rutter and Robert A. Rutter, of Rutter & Russin, LLC, and Nicholas A. DiCello, Dennis R. Lansdowne, and Jeremy A. Tor, of Spangenberg, Shibley & Liber, LLP, both of Cleveland, Ohio, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Michael D. Sanders, Michelle A. Miner, and Amy E. Frantz, of Purcell & Wardrope, Chtrd., of Chicago, for appellee. |

---

| | |
|---|---|
| *Amicus Curiae*: | John H. Mathias Jr., David M. Kroeger, Megan B. Poetzel, Gabriel K. Gillett, and Sara M. Stappert, of Jenner & Block LLP, of Chicago, for *amici curiae* Restaurant Law Center *et al.* |
| | Michael R. Enright, of Robinson & Cole LLP, of Hartford, Connecticut, for *amici curiae* American Property Casualty Insurance Association *et al.* |

---