2023 IL App (1st) 220563-U

THIRD DIVISION
March 22, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

Nos. 1-22-0563, 1-22-0731 consolidated

_____

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| OAK PARK PROSTHODONTICS, LTD and COLORADO PROSTHODONTICS, PLLC, | ) ) ) | Appeal from the Circuit Court |
| Plaintiffs-Appellants, | ) ) | of Cook County |
| v. | ) ) | 2020-L-009752 |
| TWIN CITY FIRE INSURANCE COMPANY and CHERRY CREEK INSURANCE AGENCY, | ) ) ) ) | Honorable Jerry A. Esrig, Judge Presiding |
| Defendants-Appellees. | ) | |

_____

PRESIDING JUSTICE McBRIDE delivered the judgment of the court.
Justices Reyes and Burke concurred in the judgment.

O R D E R

¶ 1    *Held*: Insurer was entitled to judgment on the pleadings and insurance agent was entitled to dismissal of claims where prosthodontic offices which incurred business losses by complying with Illinois and Colorado executive orders to suspend elective dental procedures during initial outbreak of COVID-19 pandemic did not experience "direct physical loss of or damage to" property within the meaning of their commercial insurance policies.

¶ 2    Oak Park Prosthodontics, Ltd., of Oak Park, Illinois (Oak Park), and Colorado

Prosthodontics, PLLC, of Lakewood, Colorado (Lakewood), appeal the resolution of claims they

filed against their commercial property insurer, Twin City Fire Insurance Company (Twin City),

and insurance agent, Cherry Creek Insurance Agency (Cherry Creek) after the insurer refused to

reimburse business interruption losses incurred in 2020 during the initial weeks of the COVID-19 pandemic. The two dental practices sought damages from their insurer for breach of contract and violation of Illinois and Colorado statutes regarding bad-faith handling of claims; and, alternatively, if no coverage existed, then damages from their insurance agent due to its negligence and negligent misrepresentation in procuring a policy with a virus exclusion that was not in their previous insurer's contract. The circuit court granted the insurer's section 2-615(e) motion for judgment on the pleadings and the insurance agent's section 2-615(a) motion to dismiss for failure to state a claim. 735 ILCS 5/2-615(a), (e) (West 2020) (Code). The dental practices argue primarily that the circuit court should not have followed intermediate appellate court opinions such as *Sweet Berry Café, Inc. v. Society Insurance, Inc.*, 2022 IL App (2d) 210088, that have rejected business interruption claims on grounds that COVID-19 does not cause a direct physical loss to property. They contend the courts have been misinterpreting *Traveler's Insurance Company v. Eljer Manufacturing, Inc*., 197 Ill. 2d 278, 301 (2001), in which the Illinois supreme court found that "tangible property suffers a 'physical' injury when the property is altered in appearance, shape, color or in other material dimension." They contend they satisfied *Eljer*'s definition by alleging prevalent COVID-19 cases within the immediate vicinity of their insured premises–similar to asbestos contamination of a building–that made it unsafe and impossible to conduct business as usual at their offices. With respect to the claims that are governed by Colorado law, the dentists argue that their loss comes within the Colorado supreme court's determination in *Western Fire Insurance Co. v. First Presbyterian Church*, 165 Colo. 34, 39 (1968), that a building that was saturated with gasoline to the extent that it was uninhabitable suffered a covered "direct physical loss."

1-22-0563 & 1-22-0731, cons.

¶ 3    The dentists filed two appeals which we have consolidated. The first, 1-22-0563, was filed after the circuit court dismissed with prejudice all claims that COVID-19 related losses were covered by the Twin City insurance policies, but indicated that the dentists could seek leave to amend their complaint. The second, 1-22-0731, was filed after the dentists declined to amend and the circuit court entered an order dismissing the pleading with prejudice, further specifying that final judgment had been rendered.

¶ 4    The amended complaint indicates the following. The plaintiffs are specialized dental practices which restore injured or missing teeth. Plaintiff Oak Park is an Illinois corporation. Plaintiff Lakewood is a Colorado corporation. Defendant Cherry Creek is an insurance broker licensed as an insurance producer with the Illinois Department of Insurance. Cherry Creek was the insurance producer for the two insurance policies at issue. Defendant Twin City is a property and insurance casualty company which is licensed to write insurance in Colorado and Illinois.

¶ 5    Oak Park's previous insurer was Hanover Insurance Company. Oak Park asked Cherry Creek how the proposed Spectrum Business Owner's insurance policy from Twin City was different from the Hanover policy that was lapsing and told Cherry Creek that the dental practice needed business interruption coverage. Cherry Creek responded that the policy provided equivalent "property coverage" and included " ' Business Income for Interruption of Practice.' " Cherry Creek failed to advise Oak Park that the Twin City policy "had an endorsement purporting to exclude *** viruses, whereas the Hanover policy contained no such exclusion or limitation." Similarly, Lakewood emphasized its need for business interruption coverage and Cherry Creek responded that the Twin City policy would give Lakewood business interruption coverage that was equivalent to or greater than what Hanover had provided to Oak Park (*sic*). Cherry Creek did not

- 3 -

tell Lakewood that the "Twin City [policy] provided significantly less business interruption coverage than available from other carriers" and "did not recommend any insurance policies without a limited virus endorsement and exclusion." Oak Park and Lakewood relied on Cherry Creek's representations and purchased the proposed coverage. Twin City issued a Spectrum Business Owner's insurance policy to Oak Park effective August 26, 2019 to August 26, 2020, and issued the same or substantially the same policy to Lakewood effective September 12, 2019 to September 12, 2020.

¶ 6    COVID-19 is an infectious disease that is caused by a virus that is spread by close contact and respiratory droplets. "From March through April of 2020 and continuing thereafter, [the SARS-CoV-2 virus that causes] COVID-19 was prevalent within Lakewood and Jefferson County, Colorado, including on the surfaces of property and in respiratory droplets exhaled onto and within buildings." "During April and May of 2020, and continuing thereafter, [the virus that causes] COVID-19 was prevalent within Oak Park and Cook County, Illinois, including on the surfaces of property and in respiratory droplets exhaled onto and within buildings." We note that although the dental practices alleged that the SARS-CoV-2 virus was "prevalent" in their communities, they did not allege that it was detected on any of their own properties or that they took any steps to prevent or remediate its presence onsite.

¶ 7    The United States federal government declared on March 1, 2020 that there was a global outbreak of COVID-19 and the governors of Illinois and Colorado issued disaster proclamations throughout their states on March 9, 2020 and March 11, 2020, respectively. The governors subsequently issued various executive orders intended to slow the spread of COVID-19, including a Colorado executive order dated April 8, 2020 which recognized that "[the virus that causes]

1-22-0563 & 1-22-0731, cons.

COVID-19 also physically contributes to property loss, contamination, and damage due to its propensity to attach to surfaces for prolonged periods of time."

¶ 8 Lakewood lost income when, in compliance with a Colorado order, the dental office stopped performing "elective procedures" between March 19, 2020 and April 26, 2020. Similarly, the Oak Park office lost income when, in compliance with an Illinois order, it did not perform "elective procedures" between April 1, 2020 and May 11, 2020. Oak Park and Lakewood sought coverage for their losses from Twin City. The first amended complaint does not distinguish between elective and essential procedures at the two offices, and does not disclose the magnitude of the claimed financial loss, other than to state that the amount in controversy exceeds $50,000.

¶ 9 The "Special Property Coverage Form" of the insurance policies states that Twin City "will pay for direct physical loss of or physical damage to Covered Property *** caused by or resulting from a Covered Cause of Loss." "Covered Causes of Loss" are defined as "RISKS OF DIRECT PHYSICAL LOSS" unless the loss is "Excluded" or "Limited."

¶ 10 In addition to this basic coverage for "direct physical loss of or physical damage to Covered Property," the policies include three other types of coverage that are relevant here, the first being for business income lost when a policyholder must repair or replace property that has been physically lost or physically damaged. More specifically, the policy states:

"[Twin City] will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of Restoration.' The suspension must be caused by direct physical loss of or physical damage to property at the 'scheduled premises', including personal property in the open (or in a vehicle) within 1,000 feet of the 'scheduled premises', caused by or resulting from a Covered Cause of Loss."

- 5 -

1-22-0563 & 1-22-0731, cons.

¶ 11    In this paragraph and throughout the policy, the words "you" and "your" are references to the named insured. The policies define "Period of Restoration" as the period of time that:

"a. Begins with the date of direct physical loss or physical damage caused by or resulting from a Covered Cause of Loss at the 'scheduled premises,' and

b. Ends on the date when:

(1) The property at the 'scheduled premises' should be repaired, rebuilt or replaced with reasonable speed and similar quality;

(2) The date when your business is resumed at a new, permanent location."

¶ 12    Twin City also agreed to pay for certain expenses incurred until the insureds' physically damaged property is repaired, rebuilt or replaced:

"[Twin City] will pay reasonable and necessary Extra Expense you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or physical damage to property at the 'scheduled premises,' including personal property in the open (or in a vehicle) within 1,000 feet, caused by or resulting from a Covered Cause of Loss."

¶ 13    A third type of additional coverage is "Civil Authority," which would allow an insured to recover its lost business income, provided that "access to your 'scheduled premises' is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your 'scheduled premises.' " In other words, in contrast to the other forms of coverage that require physical loss or damage at the dental offices, the "Civil Authority" coverage requires physical loss or damage to nearby property that results in an order prohibiting access to the insured premises.

¶ 14    The policies also contain an exclusion to coverage for any loss or damage caused by a virus:

> "We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:
>
> (1) Presence, growth, proliferation, spread or any activity of 'fungi,' wet rot, dry rot, bacteria or virus."

¶ 15    The virus exclusion "applies whether or not the loss event results in widespread damage or affects a substantial area."

¶ 16    Twin City denied Oak Park and Lakewood's claims for economic losses.

¶ 17    The dentists sued and then, with leave of court, filed an amended complaint. The first four counts were directed at Twin City. In Count I, breach of contract, the two dental practices sought damages from Twin City due to its denial of coverage; Count II was Oak Park's statutory claim for vexatious and unreasonable claim handling practices (see 215 ILCS § 5/155 (West 2020)); and Counts III and IV, respectively, were Lakewood's common law and statutory claims for bad faith insurance claim handling practices (see Colo. Rev. Stat. § 10-3-1115, 1116, C.R.S. 2020). Counts V and VI were directed at Cherry Creek, but were pled in the alternative, only operative in the event that the court denied coverage on the basis of the policies' virus exclusion. Twin City responded with an answer and affirmative defenses and also a motion for judgment on the pleadings. Instead of an answer, Cherry Creek filed a motion to dismiss the last two counts of the pleading for failure to state a claim. After considering briefs and oral arguments, the circuit court granted the motions. This appeal ensued.

¶ 18    The dentists first argue the circuit court erred in granting Twin City's motion for judgment on the pleadings. We address a motion for judgment on the pleadings *de novo*, without deference to the circuit court's reasoning. *Allstate Property & Casualty Insurance Co. v. Trujillo*, 2014 IL App (1st) 123419, ¶ 16. "Any party may seasonably move for judgment on the pleadings" pursuant to section 2-615(e) of the Code. 735 ILCS 5/2-615(e) (West 2020). A motion of this type is similar to a motion for summary judgment, but it is limited to the pleadings. *Trujillo*, 2014 IL App (1st) 123419, ¶ 15. More specifically, when addressing the motion, a court considers only facts that are apparent from the face of the pleadings, matter subject to judicial notice, and judicial admissions in the record. *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 385 (2005). When the pleadings disclose no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, the motion is properly granted. *Trujillo*, 2014 IL App (1st) 123419, ¶ 15. In contrast, summary judgment is proper where the pleadings, matter subject to judicial notice, admissions, affidavits, and depositions on file, when viewed in a light most favorable to the nonmoving party, reveal there is no issue as to any material fact and the movant is entitled to a judgment as a matter of law. *Lavite v. Dunstan*, 2019 IL App (5th) 170114, ¶¶ 44, 69; 735 ILCS 5/2-1005(c) (West 2020).

¶ 19    In an insurance coverage dispute, the insured bears the burden of showing that its loss is covered under the policy's terms, and once that has been shown, the burden shifts to the insurer to show that a limitation or exclusion bars recovery. *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453-54 (2009); *4220 Kildare, LLC v. Regent Insurance Co.*, 2020 IL App (1st) 181840, ¶ 29 ("To establish a *prima facie* case in a lawsuit involving an insurer's failure to pay a claim under an all-risk insurance policy, the insured has the burden to prove that (1) a loss occurred, (2) the loss

1-22-0563 & 1-22-0731, cons.

resulted from a fortuitous event, and (3) an insurance policy covering the property was in effect at the time of the loss.").

¶ 20    An insurance policy is a contract and the general rules that govern the interpretation of contracts also govern the interpretation of insurance policies. *Sproull v. State Farm Fire & Casualty Co.*, 2021 IL 126446, ¶ 19. A court's primary objective is to ascertain and give effect to the intention of the parties, as expressed in the policy's language. *Sproull*, 2021 IL 126446, ¶ 19. "The construction should be a natural and reasonable one." *Sproull*, 2021 IL 126446, ¶ 19.

> [There is] a general rule that an integrated contract, unless it is ambiguous or controlled by some rule of law establishing a definite meaning, is to be given the meaning which would be attached to the contract by a reasonably intelligent person acquainted with all the operative usages and knowing all of the circumstances existing prior to and at the time of the contract, other than oral statements by the parties of what they intended it to mean." 2 Couch on Insurance § 22:38 (Steven Plitt *et al.* eds., 3d ed. Dec. 2021 update).

¶ 21    Accordingly, unambiguous, undefined terms will be given their "plain, ordinary, and popular meaning; *i.e.*, they will be construed with reference to the average, ordinary, normal, reasonable person." *Sproull*, 2021 IL 126446, ¶ 19; *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108 (1992) (if the words in a policy are clear and unambiguous, courts read them with their plain, ordinary and popular meaning). "A policy term is not ambiguous because the term is not defined within the policy or because the parties can suggest creative possibilities for its meaning." *State Farm Mutual Automobile Insurance Co. v. Elmore*, 2020 IL 125441, ¶ 21. Policy language is ambiguous when it is reasonably susceptible to more than one meaning. *American States Insurance Co. v. Koloms,* 177 Ill. 2d 473, 479 (1997).

¶ 22 The dental practices argue that precedent such as *Sweet Berry Café*, 2022 IL App (2d) 210088, should be "overruled"[1] as inconsistent with the supreme court's definition of physical loss in *Eljer*, 197 Ill. 2d 278, which "is more than sufficient to encompass" Oak Park's allegations. They contend that *Sweet Berry Café* and other intermediate appellate courts have employed "a counter-intuitive definition of 'physical loss,' " that would not be understood by an "average, ordinary person" and is "apparently based on threadbare scientific speculation." They contend that the presence of deadly, invisible pathogens within the immediate vicinity of their offices (but not actually alleged to have been detected at either location) altered a material dimension of their insured property, consistent with *Eljer*'s determination that " 'physical' injury occurs when property is altered in appearance, shape, color or in other material dimension." *Eljer*, 757 N.E.2d at 500. They do not specify, however, whether that material, physical change at the dental offices occurred in the appearance, shape, color, or other material dimension of the insured property. They argue that the presence of the SARS-CoV-2 virus near their offices is equivalent to the presence of asbestos-containing building materials and toxic asbestos fibers which an architectural firm documented inside three high schools in *Board of Education of Township High School District No.*

---

[1] We have authority to disregard but not overrule an erroneous ruling of an equal court.

"[The decision of an intermediate] appellate court may only be reversed or overruled by [the supreme court]. See 21 C.J.S. *Courts* § 152 (1990) ('the decision of an intermediate appellate court is the law of the state or jurisdiction until such decision is reversed or overruled by the court of last resort'); J. Eaton, *Resolving Conflicts in the Illinois Appellate Court,* 78 Ill. B.J. 182 (1990) ('The Illinois appellate system was structured on the assumption that the supreme court would resolve conflicts between districts, divisions, or panels of the appellate court'). *** [An appellate court is not bound to follow what it believes to be an erroneous decision of an equal or inferior court]*,* but as a court of equal dignity it ha[s] no authority to 'abrogate' that decision." *Gillen*, 215 Ill. 2d at 392 n2.

*211 v. International Insurance Co.*, 308 Ill. App. 3d 597, 600 (1999). Also, there is "no meaningful distinction between the gasoline infiltration in *Western Fire* and the pervasiveness of COVID-19 in and around [the Colorado dental office] during the time periods at issue here." *Western Fire*, 165 Colo. 34. They also contend that "the microscopic nature of [the virus actually] makes it more damaging and more dangerous" than either asbestos or gasoline saturation. They propose that we follow the lead of the Vermont Supreme Court when it found in *Huntington Ingalls Industries, Inc. v. Ace American Insurance Co.*, 2022 VT 45 (Vt. Sept. 23, 2022), that similar allegations of a physical loss due to COVID-19 were sufficient at the pleading stage.

¶ 23    Twin City responds that judgment on the pleadings was warranted because the dental practices suffered no "direct physical loss of or physical damage to Covered Property," which is the threshold for coverage. The insurer points out that *Eljer*, a 2001 decision, is not some newly-decided or newly-discovered supreme court case that casts doubt on the dozens of recent state and federal appellate decisions that have been uniformly applying Illinois law. Policyholders have argued that *Eljer* supports their pandemic-related coverage claims, but the courts have consistently rejected this interpretation of the case. Twin City adds that when the circuit court granted the insurer's motion for judgment on the pleadings, the court joined the vast consensus of courts nationwide that have rejected COVID-19 business interruption claims.

¶ 24    Twin City's position is persuasive. At this point, more than a dozen Illinois appellate courts have ruled that commercial property insurance policies do not cover economic losses sustained by businesses during the pandemic, despite the policyholders' attempts to attribute their financial losses to "physical loss," "physical damage" from the SARS-CoV-2 virus or the insureds' compliance with executive orders. Most of these decisions are unpublished because they would

1-22-0563 & 1-22-0731, cons.

add nothing new to the body of Illinois law.[2] In other words, it is well established in this jurisdiction that a presence of the SARS-CoV-2 virus or the issuance of government orders to modify business practices, even to the point of closure, does not cause physical loss of or damage to tangible property.

¶ 25    *Sweet Berry Café*, 2022 IL App (2d) 210088, was the first Illinois state court opinion. The insured was a cafe in South Elgin, Illinois that sought reimbursement through its Society Insurance "Businessowners Policy" for financial losses it attributed to the COVID-19 pandemic and the governor's orders temporarily prohibiting on-premises consumption in bars and restaurants. *Sweet Berry Café*, 2022 IL App (2d) 210088. Like the Twin City policies, the Society Insurance policy covered " 'direct physical loss of or damage to Covered Property' " unless excluded or limited, and required a direct physical loss of or damage to covered property in order to invoke the additional forms of coverage for business income and extra expense. *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 4. The circuit court granted the insurer judgment on the pleadings.

¶ 26    On appeal, the South Elgin business contended it sustained losses due to the virus's presence at and around the cafe premises. After consulting dictionary definitions for " 'direct,' " " 'physical' " and " 'loss' " and *Eljer*, 197 Ill. 2d 278, which had interpreted the term "physical injury to tangible property," the Second District determined that " 'physical loss' unambiguously requires that the deprivation be caused by a material thing, which necessarily rules out economic losses resulting from [the insured's] inability to fully run its business." *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶¶ 40-42. The court rejected the notion that the virus had a material existence

---

[2] On November 20, 2020, the Illinois Supreme Court amended Supreme Court Rule 23 to allow unpublished Rule 23 orders issued on or after January 1, 2021 to be cited for persuasive purposes. Ill S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021).

and had physically damaged tangible property by rendering it unusable when it adhered to surfaces. *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 43. It distinguished the presence of SARS-CoV-2 from asbestos and noxious gas contamination that rendered premises unusable. *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 43. In contrast, "no property needed to repaired or replaced" at the insured restaurant. *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 43. Furthermore, "unlike a noxious gas, for example, the virus's presence is easily remediated by routine, not specialized or costly, cleaning and disinfecting or [the virus] will die off after a few days." *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 43. The Second District cited federal decisions and the nation's Centers for Disease Control & Prevention for the propositions that (1) the presence of the virus had not altered the physical structures and there was no reason to think that the virus could have this effect, and (2) SARS-CoV-2 was easily wiped off surfaces with routine cleaning or would shortly disintegrate on its own. *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 43 (citing *Sandy Point Dental, P.C. v. Cincinnati Insurance Co.*, 20 F.4th 327, 335 (7th Cir. 2021) and *Uncork & Create LLC v. Cincinnati Insurance Co.*, 498 F. Supp. 3d 878, 883-84 (S.D. W. Va. 2020) (actual presence of virus does not trigger coverage for physical damage or loss and when "routine cleaning, perhaps performed with greater frequency and care, eliminates the virus on surfaces, there would be nothing for an insurer to cover"); "see also *COVID-19: Cleaning and Disinfecting Your Facility*, Cents. for Disease Control & Prevention (Nov. 15, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html [https://perma.cc/3NNT-HK3M] (noting that the most reliable way to prevent infection from surfaces is to regularly wash hands with soap and water or to use alcohol-based hand sanitizer; also noting that surfaces should be cleaned and disinfected if someone with the virus was present

1-22-0563 & 1-22-0731, cons.

and providing list of disinfectants, many of which are readily available consumer goods).” The ease of cleaning SARS-CoV-2 off surfaces was such common knowledge that the trial court had properly taken judicial notice of that fact. *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 43.

¶ 27    The insured also argued that it had sustained direct physical loss when the governor prohibited access and/or significantly reduced access to on-site consumption of food and beverages. The executive orders, however, were not “connected to any change in the physical condition of the premises or property at the premises, nor did [they] cause any physical harm to the premises or any property.” *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 45. The cafe had suffered an economic loss, not a direct physical loss. *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 45.

¶ 28    The Second District remarked that its decision was in line with the majority of cases nationwide addressing the possibility of coverage for pandemic-related losses under commercial property insurance policies. *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 48 (citing, in part, *Inns by the Sea v. California Mutual Insurance Co*., 71 Cal. App. 5th 688, 286 Cal. Rptr. 3d 576, 579 n.1 (2021) “(in opinion dated November 15, 2021, noting that ‘overwhelming majority of federal district court cases find no possibility of coverage under commercial property insurance policies for a business’s pandemic-related loss of income’ and each federal appellate court to consider the issue concluded the same; collecting cases).” See also 10A Couch on Insurance § 148:46 (Stephen Plitt *et al* eds., 3d ed. Nov. 2022 update) (“The requirement that the loss be ‘physical,’ given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable,

physical alteration of the property."). "Indeed, all published federal appellate court decisions have ruled in the insurance companies' favor." *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 49.

¶ 29     The Second District concluded, "the partial loss of Café's use of its premises, without any physical alteration to the property or a deprivation of use or access so substantial as to constitute a physical dispossession, was not sufficient to allege a 'direct physical loss of or damage to' its property to trigger coverage under Society's business interruption or extra expense additional coverages." *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 55. "We hold that neither the presence of the virus at Café's premises nor the pandemic-triggered executive orders that barred in-person dining at restaurants constitute 'direct physical loss of or damage to' Café's property." *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 1.

¶ 30     Within a week, in *Lee*, the First District Appellate Court addressed whether a restaurant in Evanston, Illinois seeking reimbursement for business income lost during the governor's closure period had sustained a loss compensable by its businessowner's insurance. *Lee v. State Farm Fire & Casualty Co.*, 2022 IL App (1st) 210105. Like the Second District, the First District considered numerous decisions of other state and federal courts addressing the same COVID-19 business interruption coverage issue, and also contemplated *Eljer*, 197 Ill. 2d 278, in order to decide whether the Illinois closure orders resulted in a "*physical* loss" within the meaning of its insurance contract. (Emphasis in original.) *Lee*, 2022 IL App (1st) 210105, ¶ 20. Like the Second District, the First District concluded that the economic loss of business income was not a covered physical loss. *Lee*, 2022 IL App (1st) 210105, ¶ 23.

¶ 31     In the ensuing weeks and months, other Illinois appellate courts confirmed that commercial property insurance policies that require direct physical loss or damage like the Twin City policies

1-22-0563 & 1-22-0731, cons.

now at issue do not cover business interruption losses occasioned by the COVID-19 pandemic and the executive closure orders. See *ABW Development, LLC v. Continental Casualty Co.*, 2022 IL App (1st) 210930 ¶¶ 32, 35 (medical imaging clinics that were subject to Illinois and Indiana orders suspending nonessential business had not sustained "direct physical loss of or damage to covered property" due to mere presence of virus on surfaces, and court's holding "join[ed] the vast majority of authority from other jurisdictions examining the same or similar policy language"); *Firebirds International, LLC v. Zurich American Insurance Co.*, 2022 IL App (1st) 210558 (same with respect to restaurant chain); *GPIF Crescent Court Hotel, LLC v. Zurich American Insurance Co.*, 2022 IL App (1st) 211335-U (same with respect to hotels, unpublished); *Ortiz Eye Associates, P.C. v. Cincinnati Insurance Co.*, 2022 IL App (1st) 211312-U (same with respect to optometry and vision business, unpublished); *Ark Restaurants Corp. v. Zurich American Insurance Co.*, 2022 IL App (1st) 211147-U (restaurants, unpublished); *State & 9 Street Corp. v. Society Insurance*, 2022 IL App (1st) 211222-U (restaurants and taverns, unpublished); *Bottleneck Management, Inc. v. Zurich American Insurance Co.*, 2022 IL App (1st) 211462-U (restaurants, unpublished); *Black Rock Restaurants, LLC v. Society Insurance*, 2022 IL App (1st) 211215-U (restaurants, unpublished); *R Restaurant Group, LLC v. Society Insurance*, 2022 IL App (1st) 211216-U (restaurants and taverns, unpublished); *Station Two, LLC v. Society Insurance*, 2022 IL App (1st) 211217-U (restaurants and bars, unpublished); *JCJ Restaurant Co. v. Society Insurance*, 2022 IL App (1st) 211225-U (restaurant and bar, unpublished); *Lodge Management Corp. v. Society Insurance*, 2022 IL App (1st) 211133-U (restaurants and bars, unpublished); *MTDB Corp. v. American Auto Insurance Co.*, 2022 IL App (1st) 210979-U (bowling alley, unpublished).

1-22-0563 & 1-22-0731, cons.

¶ 32    The dentists take issue with Twin City's citation to these unpublished orders, because they lack precedential value. Ill S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021). Under a prior version of Illinois Rule 23, litigants were prohibited from citing unpublished orders as precedential except to support contentions of double jeopardy, *res judicata*, collateral estoppel, or law of the case. Ill S. Ct. R. 23(e)(1), Committee Comments (eff. Jan. 1, 2021). About two years ago, however, the rule was updated to reflect the shift from book-based legal research to "[t]ext-searchable electronic legal research databases [that] typically include both published opinions and Rule 23(b) orders." Ill S. Ct. R. 23(e)(1), Committee Comments (eff. Jan. 1, 2021). The current rule expressly authorizes litigants to cite nonprecedential orders entered after January 1, 2021, for persuasive purposes (Ill S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021)), which is what Twin City did. We included some of the numerous, factually-similar unpublished decisions here, not because they are controlling, but because courts generally refrain from publishing dispositions that would merely duplicate existing law. See Ill S. Ct. R. 23(a) (eff. Jan. 1, 2021) (criteria for publishing a disposition). Three years after the outbreak of COVID-19 in the United States and the resulting executive temporary closure orders, it appears to be well-settled in Illinois that those circumstances did not cause direct physical loss of or physical damage to property within the meaning of the dentists' property insurance policy.

¶ 33    Meanwhile, the federal Seventh Circuit, applying Illinois law, was reaching the same conclusions and rejecting physical loss or damage claims attributed to the pandemic and/or closure orders. See *Bradley Hotel Corp. v. Aspen Specialty Insurance Co.*, 19 F.4th 1002, 1007 (7th Cir. 2021) (when insured hotel suspended in-person dining and cancelled events due to executive orders it "allege[d] loss of use that is not tethered to any direct physical loss or damage that could

- 17 -

serve as a covered cause of loss" under its general business property policy); *Crescent Plaza Hotel Owner, L.P. v. Zurich American Insurance Co.*, 20 F.4th 303 (7th Cir. 2021) (under Illinois law, losses due to "direct physical loss or damage" to property, in a property policy, did not apply to loss of use of property without any physical alteration); *Sandy Point Dental*, 20 F.4th 327 (remarking upon the "avalanche of insurance claims [that] has followed in the wake of the pandemic, as the suffering businesses look for assistance in absorbing those losses," and concluding that a private dental practice, food and beverage establishments, and a hotel that closed and/or curtailed operations in response to executive orders did not experience "direct physical loss"); *East Coast Entertainment of Durham, LLC v. Houston Casualty Co. & American Claims Management, Inc.*, 31 F.4th 547 (7th Cir. 2022) (insured movie theaters' mere loss of use of business due to North Carolina closure order did not experience "direct physical loss of or damage to property" within business income coverage provision of insurance policy); *Paradigm Care & Enrichment Center, LLC v. West Bend Mutual Insurance Co.*, 33 F.4th 417 (7th Cir. 2022) (Illinois and Michigan childcare centers whose business disruption claims caused by pandemic were denied did not plausibly allege "direct physical loss of or damage to" property or any other facts falling within the scope of insurance coverage); *AFM Mattress Co., LLC v. Motorists Commercial Mutual Insurance Co.*, 37 F.4th 440 (7th Cir. 2022) (same regarding mattress stores).

¶ 34      We could belabor the point by discussing other jurisdictions' rulings, but suffice to say that one court observed a pattern to these types of cases:

"The analysis in each of these cases follows similar steps:

1. The court applies traditional principles of contract interpretation in seeking 'to give effect to the intent of the parties as expressed in the clear language of the

1-22-0563 & 1-22-0731, cons.

contract.' [Citation omitted.]

2. The phrase 'direct physical loss or damage' is unambiguous. It requires physical damage to the insured properly itself as a condition for coverage. [Citation omitted.] Courts commonly require proof of a change or alteration of the insured structure or property to establish that it suffered damage or loss. [Citation omitted.]

3. The presence of the COVID-19 virus in the air or on surfaces of a covered property does not qualify as damage to the property itself. The virus is short-lived—if 'life' is the correct expression—and is rendered harmless by the passage of a few days of exposure to the environment.

4. Because the presence of the virus does not alter the covered property, it is different from radiation, chemical dust and gas, asbestos and other contaminants which may persist and damage the covered property.

5. Governmental orders which restrict access to property do not give rise to a covered loss unless they result from an incident of direct physical loss or damage which is itself a basis for insurance coverage." *Kim-Chee LLC v. Philadelphia Indemnity Insurance Co.*, 535 F. Supp. 3d 152, 158-59 (W.D.N.Y. 2021).

¶ 35    In a nutshell, many courts have distinguished the presence of the SAR-CoV-2 virus from contaminants that damage property, rejected arguments that SARS-CoV-2 in the air or on surfaces is damage to the property itself, and been unpersuaded that government orders in early 2020 intended to curb social interaction and other means of virus transmission caused direct physical loss or damage on the businesses that consequently lost income.

¶ 36    Nonetheless, the dentists contend that courts applying Illinois law have reached the wrong

result because they misunderstood *Eljer*, 197 Ill. 2d 278, and then held as a matter of law and without benefit of any facts beyond the pleadings that COVID-19 does not cause an insured loss. However, *numerous* Illinois courts have engaged in thorough legal analyses and arrived at the same conclusions. We reiterate that in *Sweet Berry Café*, the Second District not only consulted *Eljer* but also dictionary definitions to establish the meaning of the policy language "direct physical loss of or damage to [property]." Then the court reviewed precedent addressing direct physical loss due to contaminants (including asbestos and noxious gas) that rendered property uninhabitable or unsuitable for its intended purpose, because the plaintiff cafe was arguing that the virus had rendered its property unusable. *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 43. Within this framework, the court looked at the fact that "no property needed to be repaired or replaced" as an indication that there was no direct physical loss of or damage to property. *Sweet Berry Café*, 2022 IL App (2d) 21088, ¶ 43. The Second District also relied on the fact that handwashing combined with either the routine use of consumer-level disinfectants or simply waiting "a few days" for the virus to die off as indications that there were no direct physical loss or damage to property. *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 43. When *Sweet Berry Café* was filed nearly a year ago, the ease of cleaning SARS-CoV-2 off surfaces was already such common knowledge that the Second District trial court had properly taken judicial notice of that fact. *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 43. We agree with the Second District's solid legal reasoning and fact-based conclusion in *Sweet Berry Café* that the virus is incapable of causing direct physical loss. Moreover, in *Lee*, our own district, the First District, undertook an independent consideration of the coverage language and precedent, including *Eljer*, and reached the same result.

1-22-0563 & 1-22-0731, cons.

¶ 37    Most of the Illinois authority cited above was available to the dentists when they filed their opening appellate brief in September of 2022 and their reply brief in support of the appeal in December of 2022. However, as Twin City aptly remarks, the dentists "do not even try to distinguish this wall of precedent. Instead, they just assert that the decisions are all wrong." The dentists have not pointed to any factual allegation in their first amended complaint which casts doubt on the conclusion that the SARS-CoV-2 virus is "easily remediated" with ordinary cleaning materials and even dissipates on its own "after a few days" without causing a physical change to property. *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 43. See *Bottleneck Management*, 2022 IL App (1st) 211462-U, ¶ 28 ("due to the nature of the COVID-19 Virus, [the plaintiff] did not, and could not, allege that the virus caused an alteration in appearance, shape, color or in other material dimension to its property"); *Sandy Point Dental*, 20 F. 4th at 335 ("While the impact of the virus on the world over the last year and a half can hardly be overstated, its impact on physical property is inconsequential: deadly or not, it may be wiped off surfaces using ordinary cleaning materials, and it disintegrates on its own in a matter of days.").

¶ 38    They also contend that for some businesses, the virus was "merely inconvenient," but for a health care practice like prosthodontics, the virus rendered the two "businesses totally inoperable." Also, "the emergence and persistence of COVID-19 posed operational challenges that totally prevented them from using their premises." These are contentions that unpersuasively "equate[s] loss of use with 'direct physical loss.' " *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 45 (ceasing and/or significantly reducing access to operations at the covered premises did not cause a tangible loss of or damage to insured property, it caused an economic loss). As *Sweet Berry Café* reasoned, "The prohibition on [the dentists' non-essential prosthodontic services] was not

connected to any change in the physical condition of the premises or property at the premises, nor did it cause any physical harm to the premises or any property." *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 45. Looking that the circumstances objectively, all of the dentists' insured property remained intact, that is, it was not physically lost or physically damaged by the virus or the executive orders. None of the property was stolen, damaged, or destroyed. The dentists apparently kept using their property consistent with the orders, for essential dental procedures, but not as extensively as they would have liked, for elective procedures. While the dentists lost some profitable *use* of their property, they did not lose any property, and, thus did not experience an insured loss. See *Sandy Point Dental*, 20 F. 4th at 335 ("Sandy Point may have been unable to put its property to its preferred (and, we assume, its most lucrative) use. But this is a far cry from the complete physical dispossession of property suffered by the policyholders in the gas-infiltration cases. Sandy Point at all times remained able to perform some dental work, and nothing precluded it from using the property for some other non-dental purpose consistent with the closure orders.").

¶ 39    Unable to find support in Illinois law, the dentists resort to *Huntington Ingalls*, 2022 VT 45, a split 3-to-2 decision by the Vermont Supreme Court that allowed claims to survive judgment on the pleadings. Even if the Vermont opinion was controlling, the dentists' claims would still fail because their pleading is not like the *Huntington Ingalls* pleading. The Vermont plaintiff was an employer that alleged the continuous presence of the virus that causes COVID-19 at its insured premises during its one-year policy. *Huntington Ingalls*, 2022 VT 45, ¶ 41. In March 2020, when the coverage took effect, over 1,000 of its employees tested COVID-positive at the jobsite, and by April 2021, the positive tests exceeded 6,000. *Huntington Ingalls*, 2022 VT 45, ¶ 10. These and other allegations warranted an opportunity for factual development in the trial court. *Huntington*

1-22-0563 & 1-22-0731, cons.

*Ingalls*, 2022 VT 45, ¶¶ 41-42. But the dentists did not allege that SARS-CoV-2 was even detected at their insured premises, only that the virus was "prevalent" in their communities, "including on the surfaces of property and in respiratory droplets exhaled onto and within buildings" and that in March and April 2020, Illinois and Colorado's governors issued orders prohibiting elective surgeries and procedures for about six weeks. The dentists supported their allegation about the virus's prevalence by citing general statistics published on their county health officials' websites: "See https://datacdphe.opendata.arcgis.com/search?tags=covid19" and "See https://www.dph.illinois.gov/covid19/covid19-statistics." The Vermont court specified that no direct physical loss or damage to property has occurred when a policyholder is claiming injuries based on "just a government order interfering with the insured's use of its property," without also detecting continuous SARS-CoV-2 virus on the insured's premises. *Huntington Ingalls*, 2022 VT 45, ¶ 42. The court cited instances when there was a loss of use of property because of a government order, but no direct physical loss, and thus, no coverage. *Huntington Ingalls*, 2022 VT 45, ¶ 34. One such example was *Source Food Technology*, in which there was no evidence of "mad cow disease" contamination in the beef that a Minnesota meat wholesaler ordered from Canada, there was only a government order blocking the shipment of beef over the border due to the disease outbreak. *Huntington Ingalls*, 2022 VT 45, ¶ 34 (citing *Source Food Technology, Inc. v. United States Fidelity & Guaranty Co.*, 465 F.3d 834, 838 (8th Cir. 2006)). Another example the Vermont court gave was *Philadelphia Parking Authority*, in which there was no coverage for the economic loss sustained by an airport parking lot when the Federal Aviation Administration grounded all planes temporarily after the terrorist attacks on September 11, 2001. *Huntington Ingalls*, 2022 VT 45, ¶ 34 (citing *Philadelphia Parking Authority v. Federal Insurance Co.*, 385 F. Supp. 2d 280,

- 23 -

1-22-0563 & 1-22-0731, cons.

281 (S.D.N.Y. 2005)). "[N]o purely economic loss can constitute a direct physical loss, because any loss must link back to the condition of the property in question." *Huntington Ingalls*, 2022 VT 45, ¶ 34. The dentists' failure to plead the detection of SARS-CoV-2 at their offices means they did not satisfy the Vermont court's standard. Even under the Vermont standard, instead of alleging direct physical loss or damage to their property, the dentists alleged purely economic harm that does not meet the threshold of their policy's coverage.

¶ 40    More problematic for the dentists is that the Vermont court stressed that the jurisdiction has " 'extremely liberal' notice-pleading standards," which are so " 'exceedingly low' " as to permit discovery for a " 'a bare bones statement' " containing an " 'extreme or even far-fetched *** theory of liability." *Huntington Ingalls*, 2022 VT 45, ¶¶ 40, 45. Illinois is a fact-pleading jurisdiction, rather than a notice-pleading jurisdiction. *Knox College v. Celotex Corp.*, 88 Ill.2d 407, 426-27 (1981). To proceed in Illinois, a complaint must be both legally and factually sufficient, setting out all ultimate facts, rather than conclusory allegations, that support the plaintiff's cause of action. *Knox College*, 88 Ill. 2d at 426-27. See *Pantoja-Cahue v. Ford Motor Credit Co.*, 375 Ill. App. 3d 49, 61 (2007) (stating, even after taking the factual allegations as true and making inferences therefrom, "we find plaintiff's bare bones allegations lack the particularity and specificity necessary to support a cause of action"); *Dep't of Healthcare & Family Services ex rel. Daniels v. Beamon*, 2012 IL App (1st) 110541, ¶ 14 (with regard to a "bare-bones" petition to modify child support, "the court did not err in granting respondent's motion to strike where the petition was clearly insufficient to state a cause of action"). The dentists contend that the dismissal of their barebones complaint "marks a major shift in Illinois insurance coverage law," but they are actually asking an Illinois court to disregard the pleading standard that applies to all complaints in

- 24 -

1-22-0563 & 1-22-0731, cons.

this jurisdiction, whether the pleading concerns insurance coverage law or some other theory of liability.

¶ 41    The dentists' appeal is not supported by *Huntington Ingalls*, 2022 VT 45, and their argument contravenes not only Illinois precedent, but also the consensus nationwide rejecting COVID-19 business interruption loss claims.

¶ 42    With respect to the Colorado office, the dentists rely on *Western Fire*, 165 Colo. 34, for the proposition that their losses are covered by the Twin City policy. As we introduced at the outset of this order, in *Western Fire*, a building was rendered uninhabitable after gasoline infiltrated the soil under and around it and gasoline and vapors permeated the foundation and interior of the building. *Western Fire*, 165 Colo. at 36. The court deemed this infiltration a "direct physical loss" within the meaning of the property policy. *Western Fire*, 165 Colo. at 39. We disagree with the dentists' contention that the gasoline saturation in *Western Fire* is like the pervasiveness of SARS-CoV-2 "in and around" the Colorado dental office and rendered the premises unfit for its intended purpose during March and April 2020. The dentists did not allege the virus was ever detected "in" their insured premises, only that it was "prevalent within [the community known as] Lakewood and Jefferson County, Colorado, including on the surfaces of property and in respiratory droplets exhaled onto and within buildings." They cannot change the contents of their pleading on appeal. Furthermore, unlike the building in *Western Fire*, the Colorado dental office was never rendered "uninhabitable." The SARS-CoV-2 virus and the executive orders it prompted temporarily prevented the dentists from using their property to its most profitable extent. The dentists did not even have to stop using their offices, they only had to stop using their offices to perform nonessential, elective procedures. As the Seventh Circuit reasoned when distinguishing *Western*

1-22-0563 & 1-22-0731, cons.

*Fire* and other gas infiltration cases:

> "[T]he gas infiltration [in those cases] *** led to more than a diminished ability to use the property. It was so severe that it led to complete dispossession–something easily characterized as a 'direct physical loss.' *** [Gas] contamination made the premises 'uninhabitable,' *** 'unfit for normal human occupancy,' ***. In other words, the gas infiltration made physical entry impossible, thus barring all uses by all persons.
>
> That distinguishes these [gas infiltration] cases from [COVID-19 business interruption cases], where–at most–the [policyholder's] preferred use of the premises was partially limited, while other uses remained possible. Without any physical alteration to accompany it, this partial loss of use does not amount to a 'direct physical loss.' " *Sandy Point Dental*, 20 F.4th at 334.

¶ 43     Unlike the building in *Western Fire*, the Colorado insured premises could always be physically entered and inhabited. If the dentists had pled the presence of SARS-CoV-2 on their premises (which they did not plead), that would not make the premises uninhabitable, as the building was in *Western Fire*. The prosthodontics practice was one of the types of businesses that the executive orders allowed to remain open, inhabited, and used, just not used as the business owner would have preferred for its greatest profit. The only risk associated with its use occurred when multiple people gathered inside the building, and even then, the risk was to human health, not property, and was posed by the in-person contact, not any condition of the property.

¶ 44     The dentists also cite a Boulder County, Colorado trial court order, which we decline to consider, because trial court orders lack precedential value. *People v. Amor*, 2020 IL App (2d) 190475, ¶ 21.

1-22-0563 & 1-22-0731, cons.

¶ 45    The dentists have not shown that Colorado law diverges from Illinois law in this circumstance.

¶ 46    In sum, the dentists have failed to show that direct physical loss or direct physical damage to covered property was sustained by their Illinois or Colorado location due to the pandemic or executive orders in early 2020. They have failed to show that the prevalence of COVID-19 cases in their communities and/or the entry of government orders equated with the compensable losses addressed in *Eljer*, 197 Ill. 2d 278, or *Western Fire*, 165 Colo. 34.

¶ 47    The dental practices contend that they are entitled to Civil Authority coverage based on a straightforward reading of the policy and the Illinois and Colorado executive orders issued in March 2020 which temporarily halted elective procedures. The relevant policy language was quoted above. This additional type of coverage required a physical loss, not at the insureds' own properties, but "to property in the immediate area of [the] 'scheduled premises,' " and we have already concluded that the dental practices did not allege a physical loss within the meaning of the Twin City policies. Accordingly, we need not respond further.

¶ 48    Given our conclusions that SARS-CoV-2 and/or the Illinois or Colorado executive orders did not cause direct physical loss or physical damage to the insured property, we need not reach either Twin City's argument that the virus exclusion provides an independent basis to deny coverage, or the dentists' argument that they qualify for an exception to that virus exclusion.

¶ 49    The pleadings showed no genuine issue of material fact, and Twin City was entitled to judgment as a matter of law. We affirm judgment on the pleadings in favor of Twin City as to Counts I, II, III and IV of the first amended complaint in which the dental practices claimed that the insurer not only breached the policies by denying coverage but also ran afoul of Illinois and

1-22-0563 & 1-22-0731, cons.

Colorado's statues regarding reasonableness and fairness in insurance claims handling.

¶ 50   Last, the dental practices argue about the sufficiency of their allegations against their insurance agent, Cherry Creek, which the circuit court dismissed pursuant to section 2-615 of the Code, for failure to state a claim. 735 ILCS 5/2-615 (West 2020). Counts V and VI would become operative only if the court denied coverage on the basis of the policies' virus exclusion. More specifically, in Count V, the two dental practices, alleged in relevant part:

"46. Plaintiffs specifically sought insurance coverage through Cherry Creek that was equivalent in business interruption coverage and limits provided by Hanover Insurance Company. Hanover's 2018 policy issued to Oak Park Prosthodontics did not contain an exclusion for losses arising from viruses.

47. Twin City denied coverage to Plaintiffs under each Policy at least in part on the basis of a virus exclusion in the Policy. *To the extent that Twin City's coverage denial is upheld on the basis of the virus exclusion in the Twin City Policy*, Cherry Creek negligently failed to procure the insurance required by Plaintiffs. (Emphasis added.)

48. *To the extent that Twin City's coverage denial is upheld on the basis of the virus exclusion in the Twin City Policy*, Cherry Creek's negligence caused Plaintiffs both compensatory and consequential damages, including the amount of business interruption insurance denied and attorneys' fees and costs incurred in efforts to obtain insurance benefits on Plaintiffs' behalf." (Emphasis added.)

¶ 51   In Count VI (which was misstyled as a second Count V), "in the Alternative: Negligent Misrepresentation (against Cherry Creek)," the allegations included:

"51. Plaintiffs specifically sought insurance coverage through Cherry Creek that was

equivalent to or greater than the business interruption coverage and limits provided by Hanover, and asked Cherry Creek how the Twin City insurance coverage differed from that provided by Hanover. Cherry Creek negligently failed to advise that Hanover's policy did not contain an exclusion for losses arising from viruses, in addition to other material differences.

\*\*\*

53. *To the extent that Twin City's coverage denial is upheld on the basis of the virus exclusion in the Twin City Policy*, Cherry Creek's negligent misrepresentations and omissions caused Plaintiffs both compensatory and consequential damages[.]" (Emphasis added.)

¶ 52     When a plaintiff fails to state a claim upon which relief may be granted, their allegations are properly dismissed pursuant to section 2-615 of the Code. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006); *Zahl v. Krupa*, 365 Ill. App. 3d 653, 658 (2006).

¶ 53     The circuit court's written order does not specify why it disposed of any of the counts, and the record on appeal does not include a hearing transcript. Nevertheless, all of the parties agree that the circuit court granted judgment for Twin City as to Counts I through IV for the same reasons we expressed above, and also did not reach the virus exclusion arguments. Therefore, Counts V and VI against Cherry Creek, which were conditioned on whether Twin City prevailed in the lawsuit on the basis of the virus exclusion, were properly dismissed for failure to state a claim. *Marshall*, 222 Ill. 2d at 429; *Zahl*, 365 Ill. App. 3d at 658.

¶ 54     We affirm the dismissal of those latter two counts of the first amended complaint.

¶ 55     Affirmed.